## COUNTIES MAY PAY PART OF SALARY OF COMMON PLEAS JUDGES.

Common Pleas Court of Henry County.

STATE, EX REL HESS, v. GEORGE E. RAFFERTY ET AL.*

Decided, June 15, 1916.

*Constitutional Law—Validity of Section 2252, G. C., Providing for Payment of Additional Salary to Common Pleas Judges.*

The common pleas judges of Ohio are not state officers, but act in a dual capacity, partly for the state and partly for the county in which they are elected, and payment to a judge by the county in which he serves of the amount provided in Section 2252 is not in conflict with any constitutional provision.

*Otto W. Hess,* in *propria persona.*
*K. W. Cahill* and *John W. Winn,* for respondents.

SCOTT, J.

The relator, Otto W. Hess, as a tax-payer, brings this action, seeking to obtain, by decree of this court, a prohibitive, perpetual injunction against the respondents, George E. Rafferty, as auditor, and Frank C. Fisk, as treasurer of said county, restraining said Rafferty, as auditor of said county, from issuing a warrant or warrants for payment of the additional salary of Orville Smith, the resident judge of the court of common pleas of said county, as provided under Section 2252, G. C., of our state, and said Fisk, as such treasurer, from paying any such warrant to said judge. Also restraining said auditor from placing upon the tax duplicates of said county any levy or levies for the purpose of raising revenue to meet such additional salary of said judge, and for any and all proper relief in the premises. The relator in his bill recites in substance that he was born and raised in the county of Henry, Ohio, and that he is

---

*Affirmed, *State, ex rel Hess,* v. *Rafferty,* 26 C.C.(N.S.), 408.

now, and has been, during all the times mentioned, a resident and property owner and tax-payer of said county; that on May 16, 1916, he requested the prosecuting attorney of said county, in writing, to institute a suit for the same purpose for which he brings this action, and that said prosecuting attorney failed, neglected and refused to bring said suit.

That the respondent, George E. Rafferty, is the duly elected, qualified and acting auditor of said county; that the respondent, Frank C. Fisk, is the duly elected, qualified and acting treasurer of said county.

That Orville Smith is the duly appointed, qualified and acting resident judge of the court of common pleas of the state of Ohio, in and for the county of Henry.

That the respondent, George E. Rafferty, as such auditor, will, unless restrained by an order of the court, issue his warrant upon the local treasury of said county, for the payment of the additional salary to said judge, as such acting judge of said court; and the respondent, Frank C. Fisk, as such treasurer, will, unless restrained by an order of this court, pay said warrant out of the funds of said county, raised by local taxation upon the tax-payers of said county; and the respondent, Rafferty, as such auditor, will, unless restrained by an order of this court, levy a tax upon the tax-payers of said county for the purpose of creating a fund to pay such additional salary to such common pleas judge, and his successor or successors in office.

The relator then copies in his bill Section 2252, G. C., and shows that this quoted section of the code is the particular law which contravenes the state and federal Constitutions.

The bill closes with a prayer for the relief sought.

The respondents answer, admitting that the relator was born and raised in Henry county, Ohio; that he is a resident of said county; that the respondents are the elected, qualified and acting officials, as averred in the bill; that said Orville Smith is the appointed and acting common pleas judge of said county; that the respondent, Rafferty, as such auditor, will, unless re-

strained, issue his warrant upon the treasury of the county for payment of the alleged additional salary to said judge; that the respondent, Fisk, as such treasurer, will, unless restrained, pay such warrant out of the funds of said county, raised by local taxation upon the tax-payers of the county.

Then follows a general denial of all the allegations of the bill which are not specifically admitted to be true.

These respective pleadings raise the issues of law and fact which the court is now called upon to consider and determine.

The cause was ably and eloquently argued and presented by the learned counsel upon either side, and finally submitted for our exquisite pleasure.

The evidence adduced upon the hearing of the case, tends to establish, fully, the averments of the bill, in so far as they relate to the place of birth of the relator, his residence and his standing as a tax-payer of the county. The evidence, also, shows beyond dispute, that prior to the bringing of the action, the alleged request in writing was, by the relator, served upon the prosecuting attorney of the county, and that said prosecutor refused to bring the suit.

All of the preliminary and necessary steps to enable the relator to institute this suit were taken since the dawning of the present year. He has shown himself fully equipped and qualified to bring and prosecute the "Cause Celebre," and to push it, with all his vigor, from this court to that of the Supreme Court of the nation.

The fact that the relator paid no tax into the county coffers until some time after the action was planted in this court, can have no significance or bearing in determining the real issue in the case, which issue touches and drags into question the constitutionality of the section of the statute referred to.

Our purpose in deciding the true contention herein is to close our eyes and ears to all things that smack of technicalities, and base our decision on the real merits of the controversy.

The people, not only of Henry county, but of the whole state, want to know whether their judges have been drawing salaries for these many years, to which they never were entitled.

Again, the fact that the relator is a small tax-payer, and for the first time in his life paid, since the commencement of this suit, the sum of sixty-six cents into the county treasury, can have no influence upon the court in deciding the salient issue herein.

If the amount of tax paid by relator were the ''bone of contention,'' we would feel like avoiding a decision of the case by re-paying to him the sum expended in making preparation to bring the suit.   We know however, that, no matter how dearly we might wish to avoid our duty, and its performance, yet we can not escape our labor in any way other than by a strict performance of the obligation laid upon us by an assignment made by the chief justice of the Supreme Court of the state.

It is astounding, however, to know that the relator is the only citizen, out of several million in the state, who has exhibited the nerve and courage to lay aside the busy affairs of life long enough to have this great question relating to the constitutionality of the law in dispute settled.

The action is planted in a court of equity, and the relief sought is that of injunction.

The burden in the case. rests upon the relator.   The court will grant a perpetual injunction only when a party, seeking such injunction, shows a clear right thereto.

The power to grant writs of injunction is one of the extraordinary powers of a court of equity and should only be exercised in cases where a great and important public question, affecting the rights of a citizen, is at stake, and to prevent injuries which would otherwise be irreparable, or when the magnitude of the injury to be dreaded is so great, and the risk so imminent, that no prudent person would think of incurring it.

It is illuminating and refreshing to one's mind, at this crucial time, to recall from the silent chambers of the memory, these old, well grounded and recognized principles of the law, which have grown into maxims of equity by usage and lapse of ages.

The point which rises before our vision now, and which we must decide is: has the relator shown a clear right to have and receive the extraordinary remedy and relief he so ardently and earnestly seeks at the fountain of justice? A fountain, to quaff whose intoxicating contents he has shown himself willing to pay a price that would have purchased the golden goblet of the Egyptian queen.

The relator is here in double trust; first as a citizen and tax-payer of Henry county; secondly, as a young man, wearing the magic mantle of a lawyer, striving, honestly and fearlessly, to protect the Constitution of his state, and that of the republic, against the evil encroachments, brought about by an enactment of the Legislature of the state, giving to common pleas and superior court judges of the commonwealth additional salaries for their services, performed in the interest of public justice.

While it is too true that the point raised by this controversy goes directly to the constitutionality of both state and federal Constitutions, yet we shall confine our efforts to the Constitution of Ohio, and not that of the nation, for, we fancy, our legal journey will afford us ample mental recreation if ended at the exit of our state Constitution.

We shall leave the determination of the question affecting the federal Constitution to the federal courts, where it properly rests, and take consolation in so doing in the sweet words of solace found in St. Matthew, 6-34: "Take therefore no thought for the morrow; for the morrow shall take thought for the things of itself. Sufficient unto the day is the evil thereof."

We have grave doubts in our mind at this time whether this suit is actually brought by "the real party in interest," and in good faith, or for a selfish purpose. And while there is, perhaps, nothing apparent upon the surface of the record indicating a want of good faith, yet we fancy we can hear a strange and mysterious sound, "like the rustle of an invisible wing," but in fact, a subtle, silent undercurrent, which will, ere long, burst forth in its true character, to show the people of the

good county of Henry, and the state, the real policy and purpose for which this action was instituted in this court. All doubts, for the sake of the public good, will be, by us, resolved in favor of the relator.

This is not the first attack that has been made upon the courts of the state. We shall label it as the second, and its base and source may well be traced to the spot where the first attack emanated. To find the "spot," you need not go beyond the limits of Henry county. It must not be forgotten that, "In the corrupted currents of this world offense's gilded hand may shove by justice; and oft, 'tis seen the wicked prize itself buys out the law."

Approaching now the legal phase of this controversy, we take up a consideration of some of the sections of the state Constitution, the statutes connected with the subject involved, and decisions of certain of the courts.

Article IV, Section 1 of the Constitution, as amended by the voice of the people, in 1912 makes provision that:

"The judicial power of the state is vested in a Supreme Court, courts of appeals, courts of common pleas, courts of probate, and such other courts inferior to the courts of Appeals as may be, from time to time, established by law."

Article IV, Section 3 of the new Constitution provides, in substance, that in each county of the state there shall be one resident judge of the court of common pleas, and such additional resident judge or judges as may be provided by law. They shall be elected in each county by the electors of the county. Further provision is made by this section, that any judge of the court of common pleas may temporarily hold court in any other county, and until otherwise provided by law, the chief justice of the Supreme Court is given power to make assignments of judges to hold court in any county of the state. Subsequently to the adoption of the new Constitution, the Legislature, by its act, following the dictates of the new Constitution, vesting the power to assign judges to other counties than those of their resi-

dence, left the vested power in that regard where it was placed by the people when they adopted the new Constitution—in the chief justice.

Prior to the adoption of our present Constitution, the state was divided into nine judicial common pleas districts, and such districts were carved into numerous subdivisions.

Article IV, Section 7 of the new Constitution, makes provision for one probate court in each county in the state, the judge thereof to be elected by the electors of the county, and to hold his term of office for four years. This section also provides for the consolidation of the two courts, and fixes the method thereof.

No such step can be taken, however, in such matter of consolidation in counties having 60,000 and more population.

If the majority of the electors in any county wherein an election may be held to consolidate the two courts vote in favor thereof,· then the said courts become combined. The same act provides for the legal machinery and necessary equipment to run both courts after combination is once had.

Section 12 of the new Constitution provides that the judges of· the courts of common pleas shall reside in the county for which they are elected, and their term of office shall be six years.

This provision as to the residence of common pleas judges was not incorporated in the old Constitution, but such judges were required to reside in some county of their district.

Section 15 of the new Constitution provides that laws may be enacted by the General Assembly increasing the number of judges of the Supreme Court, and increase beyond one, or diminish to one, the number of judges of the court of common pleas of any county of the state.  .

Section 1532, G. C., as amended, recites:

"There shall be a court of common pleas in each county of the state, held by one or more judges, residing therein and elected by the electors thereof. Each judge shall hold office for six years, and his successor shall be elected at the election in even numbered years next preceding the expiration of his term. Each judge heretofore elected as a judge of common pleas dis-

trict shall, after the year 1914, serve as a judge of the common pleas court of the county of which he was a resident at the time of his election.''

Section 2252, G. C., being the section as modified, fixes the additional salary of judges of the courts of common pleas of the state, and in so far as the same is applicable to the questions involved in this case, recites:

''In addition to the salary allowed by the preceding section, each judge of the court of common pleas and of the superior court shall receive an annual salary equal to $25, for each one thousand population of the county in which he resided when elected or appointed, as ascertained by the federal census next preceding his assuming the duties of such office. In no case shall such additional salary be more than three thousand dollars.

''Such additional salary shall be paid quarterly from the treasury of the county upon the warrant of the county auditor. If the judge resides in a county which comprises a judicial subdivision, such additional salary shall be paid quarterly from the treasury of the county in which he resides; and if he resides in a county which is a part only of a judicial subdivision such additional salary shall be paid quarterly from the treasuries of the several counties of the subdivision, in proportion to the population thereof upon the warrants of the auditors of such counties.''

Under this section of the code, prior to its modification, the additional salary of judges was $16 for each thousand of the population of the county in which the judge resided at the time of his appointment or election, in no case more than $3,000 nor less than $1,000, and was payable out of the treasuries of the counties of the subdivision, in proportion to their population. The relator relies, with supreme confidence, to support his contention, upon the case, State v. Kreighbaum, 9 C. C., 619. This case involved the constitutionality of Section 3085, R. S., relating to the construction of armories in this state.

The Circuit Court of Putnam County had the same question under consideration in State v. Brinkman, 7 C. C., 165.

The court held the law unconstitutional in each of these cases on the ground that the national guard is a state institution, and, inasmuch as county commissioners can only levy taxes for local purposes, therefore, it follows that the commissioners of a county have no power or authority to burden the people of the county with taxes to support a state institution.

There can be no question about the correctness of this doctrine. Clearly, the national guard, or state militia, is a state institution, and under the so-called "Dick Act," passed by the Congress, the state militia is now part of the "Standing Army," and as such is yet liable to do service in our neighboring republic.

That able jurist, Judge Jenner, in the Stark county case, seems to have delivered an "obiter dictum," wherein he had much to say about the meager salaries of judges—at that time circuit court judges drew $4,000 a year for their services.

We are inclined to agree with the learned judge, in so far as the "obiter dictum" goes, but "dissent" as to all other questions determined by him in the case, *supra*.

We commend Judge Jenner, when he says, "The great state of Ohio is certainly able to pay her judicial officers a fair compensation for their services without calling upon any county to bear more than its ratable share of the burden."

Let it be remembered that the Constitution of our state nowhere attempts to fix the salary of any judge of the court of common pleas, nor does it anywhere provide the source from which such salary shall be paid.

All this is left to the wise discretion of the Legislature.

Just what particular sections of the Constitution are encroached upon by the law giving the common pleas judges an additional salary, we are not advised, as we do not have the benefit of the brief of relator, but take it that he means to point out Article X, Section 7. This article and section relate to the powers of county commissioners in levying taxes for local purposes.

It seems to us that the whole question involved in this controversy hinges upon the fact as to whether or not common

pleas judges are purely and actually state officers. If they are, then it follows as the night the day, that the relator must prevail and the respondents fail.

The relator alleges in his bill "That one Orville Smith is a duly appointed, qualified and acting resident judge of the court of common pleas of the state of. Ohio, in and for the county of Henry in said state."

Never before, in our brief career, did it dawn upon our dull intellect that a "state officer" may be elected by the electors of only one of the eighty-eight counties in the state.

If this is true, then why not do away with the election machinery of eighty-seven counties and elect our Governor, Auditor of State, Secretary of State, Attorney-General, State Treasurer, and the Chief Justice and his associates, by a vote of the electors of one county. Such policy would save unto the tax-payers, including the relator, countless thousands each year.

If this catastrophe were to happen, however, the occupation of the politician would fall into the same predicament as that of the "Black Othello" gone.

It is hotly contended by relator in his eloquent oral argument, that forsooth, because common pleas judges may be assigned by the Chief Justice to hold court in counties outside of those in which they reside, this power, so delegated by the Constitution and the law, makes such common pleas judges state officers. That is to say, because their duties, when called upon, take them to all counties of the state, it follows, therefore, that they are state officers. There may be much "method in this madness," but, surely, not much law.

Again, it is contended by relator that because common pleas judges are "constitutional officers," then it follows, they are state officers. This contention is founded upon the deepest fallacy. The clerks of the courts of common pleas of the state are "constitutional officers," but it does not follow they are "state officers."

Probate judges are "constitutional officers," elected in the same manner as common pleas judges, their terms of office and tenure, however, being four years instead of six.

Every sheriff of every county in the state is a "constitutional officer." Sheriffs have the power to search every nook and corner of the state for criminals, and to apprehend them wherever and whenever found within the confines of the state; aye, they may even pursue a fugitive of justice into any state of the Union, if armed with a requisition, and, as agent of the state only, arrest and bring back the escaped criminal. Ergo a sheriff is not only a stateless officer, but also a·United States officer (?).

All this is the finest quality of "Crowner's quest" law, but it does not savor of the spirit or letter of sound statute law.

In *State* v. *Kreighbaum, supra,* the court proceeded first to show that an armory is purely a state institution, and there can be no dispute as to this contention, and then the court calls attention to Article X, Section 7 of the Constitution, which provides that county boards of commissioners and trustees of townships shall have power of local taxation for police purposes as prescribed by law. The court then called attention to the case of *Wasson* v. *Commissioners of Wayne Co.,* 49 Ohio St., 622, and to the language following:

"The character and purpose of a law, not less than its constitutionality, are to be determined by its operation and effect. If, in effect, its purpose is one that concerns, and its benefits are to be bestowed upon the people of the entire state, or the people of a particular class in the entire state, as we have already found to be true of the act in question, then it is a law general in its character, and if it seeks to impose taxation for the carrying out of those purposes, it would seem to follow that such taxes are state taxes."

The point determined by the Supreme Court in this case is that the commissioners of a county may not levy taxes for a purpose in which all the people of the state have a common concern.

Taxes levied to raise revenue for the purpose of paying the salaries of the Governor and other state officers can well be said to be for the common benefit of all of the citizens of the state,

for that every citizen of the commonwealth is equally interested.

We are unable to conceive how these ''armory cases,'' cited by the relator, can have any possible bearing upon the question of constitutionality of the statute before us, and which statute, it is claimed, contravenes Article X, Section 7 of the Constitution, or possibly, every other article and section of the Constitution of the state. Before the change in the armory law took place, armories of the state were built and equipped for the use of a state institution—the state militia, or National Guard.

We have no doubt but that the State Capitol Building, whose beautiful dome points toward the passing clouds, was built and paid for by state funds, and this must be true because it belongs to all of the people of the state, and not to those of any particular county, but how is it as to court houses that dot the fair face of Ohio, the greatest, best and noblest of all the states? Court houses are built for each particular county, equipped for the use of the courts of the county, paid for by money arising from taxation, imposed and levied upon the citizens of the county, and are the property of the people of the county.

While we have indicated that a solution of the question involved in this controversy depends upon the fact as to whether common pleas judges are state officers, yet we are persuaded that the relator should fail, even in that event; we believe that a judge may act in a dual capacity, partly for the state and partly for the county in which he was elected.

Relator in his oral argument called our attention to some case decided by some court in the state of Tennessee, but he was unable to give us a correct reference to the case. We think this case was considered in the case of *In re Salary of Superior Court Judges*, 82 Wash., 623, which we shall consider ere we close.

The very question involved in the instant case was exhaustively considered by the Supreme Court of Washington. In discussing this case it is fit to make a comparison of those parts of the Constitution of our state and that of the state of Washington touching the judicial powers of these states, and note

that the two Constitutions in that regard are, indeed, very similar.

The judicial power of the state of Washington is vested in the Supreme Court and superior courts, and such inferior courts as may be, from time to time, created by the Legislature. The jurisdiction of the superior courts of that state is substantially the same as that of our common pleas courts. Article IV, Section 13 of the Constitution of Washington, provides that such judges shall receive salaries as prescribed by law, one half of which shall be paid by the state and the other half by the county. Section 13 fixes such salary at $3,000 each year. The Constitution also provides that the Legislature may increase such salaries, and Section 9052 of the code of the state authorizes the board of county commissioners to increase such salary to a maximum of not more than $4,000. In this case five points were raised for determination by the court, and we shall deal with the first and third, as the others have no application here.

Fullerton, J., in deciding the first point raised, used these words:

"The first contention, however, is that the superior courts are state courts, the judges thereof state officers, and hence, a statute which purports to authorize the counties to make appropriations for the salary of the judges, is a statute authorizing appropriations for the state rather than for county purposes, and is prohibited by Section 12 of Article II of the Constitution, before cited. But we think that the claim that the superior courts are state courts, and the judges thereof state officers, does not correctly define the position these courts and officers bear to the several counties, and to the state. Unquestionably, since these courts have and exercise superior and general jurisdiction over all the principal matters in controversy arising between citizens of the state, and between the state and individuals charged with violating the state laws, they perform state functions, and to that extent are state courts, and the judges state officers; but it is as equally true that they perform county functions as well.

"From an examination of the recitals we have made from the section of the Constitution defining the jurisdiction of the su-

perior courts, it will be observed that they have been granted all the jurisdiction that pertained to the county courts, existing at the time of the adopting of the Constitution, and much of the jurisdiction then pertaining to the courts of the justices of the peace. *Nowhere* in the Constitution are they denominated state courts, and it is worthy of note that the framers of that instrument were careful to say that the 'process' of such courts, not their 'jurisdiction,' shall extend to all parts of the state. Again, the judges of the superior courts are not elected by the state at large, as state officers generally are elected, but by the counties in which the courts are holden and over which they preside; and the judges so elected are permitted to sit in other superior courts only at the request of the regularly elected judge thereof or at the request of the Governor.

"The sources from which the judges' salaries are paid, and the source from which the equipment necessary to an exercise of their functions is furnished, we think lends color to the claim that the framers of the Constitution did not regard the judges of the superior courts to be strictly state officers. Their salaries as fixed by the Constitution, or as it may be fixed by the Legislature, are to be paid, one-half by the county for which they are elected and one-half by the state, and their equipment, such as the places for holding courts, the clerks, bailiffs, and other assistants are furnished wholly by the counties. On the other hand, state officers who are clearly such by the terms of the Constitution are paid wholly by the state, and their equipment necessary to the exercise of the functions furnished wholly by it. It seems, therefore, clear to us that the superior courts and the judges thereof occupy a somewhat dual position; that they perform both state and county functions, and serve both state and county purposes, and hence are officers for whose support the county may make appropriations from county funds."

Speaking of the third point raised in the case, *supra,* Fullerton, J., recites:

"But it is said that the question of the amount of the salaries of the judges is so remotely connected with any real purpose of the county, it is an abuse of the power conferred by this provision to the Constitution to authorize the county to make, or the county to pay, from its funds, an increase of salary of judges over that fixed by the general laws. This, however, is an administrative or legislative, rather than a judicial question.

"It may be that courts would interfere in a case where it was made to appear that there had been a gross abuse of the power, such, for example, as in a case where the court can clearly see that there can be no possible benefit derived by the county from the expenditure; but we can not think this is such a case. The salaries of the judges must be in a measure commensurate with the earning power of the average lawyer engaged in the profession, else men of capacity will not accept the office of judge.

"An increase of the salaries, therefore, tends to an increase of the efficiency in the administration of the laws, and the act can be justified on these grounds."

The cogency and force of the reasoning of the judge in the case, *supra,* are admirable, and we fail to comprehend how any impartial judge or lawyer can close his eyes to the potency and propriety of the argument.

While the relator, in oral argument, said nothing about the question of uniformity of the act whose constitutionality is challenged, yet we have no doubt that somewhere and sometime along the pathway of this legal controversy, some court will hear this point presented, and endeavoring to cover every possible question that may be raised, and not intending to shirk our duty, or its performance, we call attention to the case of *State* v. *Yates,* 66 Ohio St., 546.

In this case the Supreme Court held "That the uniformity of compensation which is required is not uniformity in the total amount received, but uniformity in the rate of compensation."

The statute in question does apply uniformly to all common pleas and superior court judges, and the salary of each is determined by a uniform rule, although the amount arrived at is not necessarily always the same.

In the light of the similarity of the Constitution of our state and that of Washington state, and the fact that all of the judges of that state concurred in the opinion of Fullerton, J., we are led to the inevitable conclusion that the case, *supra,* is absolutely decisive of the instant case.

With an abiding faith in the justness and righteousness of our convictions and the absolute accuracy of our conclusions,

we refuse the relief prayed for by, the relator, and cast our destiny upon the altar of justice there to "stand the hazard of the die."

Entertaining the views herein expressed, our conclusion is, and we so hold, that common pleas and superior court judges of this state are not state officers; that they act in a dual capacity, partly for the state and partly for the county in which they are elected.

That Section 2252, G. C., is not in conflict with Article X, Section 7 of the Constitution, or any other section or article of that instrument.

Injunction refused.    Petition dismissed.